21-1324. Again, Campania v. Grupo. May it please the Court, David Cooper again on behalf of the Appellants GCC. This appeal concerns the District Court's order requiring turnover of assets in Mexico from GCC and third parties. And I'll note at the outset that this Court does not have to reach this appeal if it reverses on the 60B issue, since obviously if there is no judgment, there can be no turnover. But if this Court does reach the appeal, the key point here is that the turnover order undisputedly conflicts with the Mexican court order, putting GCC in what is effectively an impossible position, where it would have to, by turning over the property, violate a Mexican court order or violate an order of a United States court. And no court, on the merits at least, has yet considered this conflict, because the Mexican court order came after the District Court issued its turnover order in this case. Before you get into that, let me ask you this question. On page 26 of your opening brief, you state that, quote, the only basis for turnover is Colorado Rule 69G, unquote. Proceeding from that premise, that would mean that we're applying state law in this context. Is that right? That's state procedural rule, yes. Well, that's state procedural rule. Yes. Well, it leads me to ask, why does the doctrine of extraterritoriality actually have any play here at all? I mean, that's a federal doctrine that would be applied in evaluating the handiwork of Congress and determining what Congress's intent was. Why does that even matter here? So we would say that it matters because the District Court applied 69G as an application of Federal Rule 69A. So that's one reason we would say it matters. The second reason is because Colorado has applied a similar rule of extraterritoriality, and no one here has suggested that there's a material difference between the two. That is, the Colorado courts, and we cite a few of them in our briefs, has said effectively the same thing that the U.S. Supreme Court has said, which is there has to be a clear statement if you want to apply a law, or in this case, a rule, extraterritorially. So while it's true that putting aside this 69A issue, if you're just looking at 69G, you're not directly applying Morrison, Kiobel, or Taranabisco, as a practical matter, there's no real difference between applying those cases and applying the Colorado law, which recognizes that they generally don't want the rules to be applied extraterritorially unless there's a clear statement of the obligations. So even if we were doing this through the prison of state law alone, 69G being in question, we would be applying an extraterritoriality analysis? That's correct. Oh, yes. So just to move back to the conflict issue, the law is clear that where there is a true conflict, as there is here, and I think it's important to look at the exact language of the Mexican court order because it's unequivocal, and this is addendum two to three of our reply brief, and it says, quote, GCC, as well as the third parties, are prohibited from carrying out and complying with any order for the enforcement of the arbitral award. So it's unequivocal. It would be a violation of the Mexican court order. This is the 2021 order, correct? Correct. Not the 2014? Correct. The 2021 order. And so there is, by any definition, a true conflict here, putting GCC in effectively an impossible position. And when there is a true conflict, courts look at which jurisdiction has the greater interest. And the district court actually found here that Mexico has the greater interest, and it's really not debatable because you're talking about a Mexican company, Mexican property, and the other side has virtually no connection with the United States as well. It's a Bolivian company. And so Mexico clearly has the greater interest, and so for a U.S. court to say, you must violate a Mexican court order with respect to a Mexican company and Mexican property to enforce a Bolivian arbitration award simply does not make sense. And to be clear, the district court never considered this issue because what the district court said was there isn't a true conflict because the order hadn't issued yet. Now there is one, and applying basic law. Well, okay, then let me get the timing right. The second Mexican TRO, if I may call it that, occurred after the turnover order. Correct. Okay. Well, what do you, how do you respond to Simpson's argument that by virtue of the turnover order, that those assets were already in the custody of the court? The assets were not in the custody of the court because the assets hadn't moved at all. I know they haven't moved at all, but constructively is what I'm talking about. So, no, I don't think that the U.S. court, I mean, first of all, I don't know of any case that suggests that when there's an order that says you must give something to the court, then the court constructively has that property. I mean, the property currently is in Mexico. And if, you know, to recall, even before the second Mexican TRO, there was a debate about whether the first Mexican TRO and Mexican law more generally barred this. And so there was this dispute about Mexican law. Now there's effectively no dispute. But for us to say that a U.S. court, when there's a dispute about Mexican law and the parties, you know, in good faith believe the Mexican law bars this, we can issue an order. And therefore, once we issue the order, it's constructively ours. Therefore, the Mexican courts can't do anything. It simply doesn't make sense. Well, why doesn't it make sense that a court has a right to preserve the integrity of its orders? I mean, the reality is that it issued an order before the Mexican court acted. And so does it not have any obligation to maintain the integrity of its own order? So, first, the Mexican court did, in fact, act first in the first TRO. We can talk about what they did. Well, yeah, but that's expired, right? We believe not. I mean, the terms of the expiration were when the annulment proceedings ended, which the clear implication was that if the annulment proceedings in Bolivia ended with the annulment, then that wouldn't be enforceable. I mean, that was the reason behind the first Mexican TRO. And, frankly, the second Mexican TRO, which is that Mexican courts are not going to enforce an award from a Bolivian arbitration award where the Bolivian courts have said it should be annulled. And so the first TRO said, well, there are these ongoing proceedings in Bolivia. We're going to issue an injunction until the Bolivian proceedings conclude. They concluded with an annulment. And so for them, for SIMSA to say, well, therefore, there's no injunction, there's no problem, clearly defies what the reasoning of that first Mexican TRO is. Well, whatever the reasoning of it is, by its terms, its terms have been exhausted, have they not? If we're looking literally and not looking at any of the rest. Yes, I'm looking literally. Well, but we also have to look at a violation of Mexican law, because that was part of the point, whether or not, even if there was, even if the order by its terms expired. And under Mexican law, Mexican law is very different. I mean, as our expert explained, injunctions don't sort of, you know, disappear of their own accord, even if by their terms there would be a limit. That is, they should have gone to a Mexican court to have it lifted. But let's put that aside for a moment. There's still a question of we can't violate Mexican law whether there's an order or not. And it was clear, based on the reasoning of the first TRO, that it would have been a violation of Mexican law to comply. In fact, that's what the second Mexican TRO said. As far as this question of, well, what happens, you know, should we respect the turnover order because it came before the second TRO? Let's even put aside the things that came before. Still, yes, the timing matters when we look at a conflict of law. That is, it does matter who goes first. But it's not everything. And here where we have a situation where — Could I just interject here? Could you, as part of the point you're making, bring in the Motorola case? The Second Circuit, and I'm quoting, said, it's well established that orders of foreign courts are not entitled to comedy if litigants who procure them have deliberately courted legal impediments to the enforcement of a federal court's orders. Yes. So here it's clear that the reason why GCC went to the Mexican court for the second TRO immediately after the turnover order was simple. GCC wanted to be a responsible Mexican company. It believed that it was a violation of Mexican law to turn it over. And as a responsible public company, it wanted to go to the Mexican court and say, can we do this? And the Mexican court said, no, you can't. And to say that GCC did something — GCC have permanently tied its hands by seeking relief. I mean, what's responsible about that? I mean, you already had an order from a U.S. court telling you what you needed to do. Then you go to the Mexican court and say, all right, tell me I can't do this so that there's a conflict. I mean, explain that to me. I explain it simply. GCC believed its hands were already tied. It went to the Mexican court to determine if that was true. And GCC is a Mexican company. It cannot simply defy Mexican law if there's some ambiguity without going to the Mexican courts to determine whether it's going to do so. Does possession, as used in the Colorado rule, mean actual possession? Or does it mean control over assets? So there is no Colorado case law directly on point. But we know that Colorado courts have used the word control — I mean, the Colorado rules use the word control. And they use the word possession here, which is not the same. And so what the clear implication — and this is what the New York courts have said, interpreting a materially identical statute, is that possession means possession. That's not the same as constructive possession. It's not the same as control. And there's no basis to believe that Colorado wanted some sui generis interpretation of the word possession here, different from what the New York courts, who deal with a lot of these turnover issues, have said when interpreting a materially identical rule. We know from a filing you made last week that there is activity in the district court on this issue. Is there any potential that what may end up happening there could move this appeal? So let me just put the court up to date so the court understands how things stand right now. So there was a turnover order based on a stay and then a standstill. It went into effect on May 7th. GCC wanted to put in a bond. It asked for that in April. On May 6th, the district court said you can only do a bond if it basically simply can collect, even if you win the turnover appeal, not if you win the 60-P appeal, but if you win the turnover appeal. We went to this court on an emergency — sorry, they filed a motion for contempt the following Monday. So this was May 9th. We went to this court on an emergency stay. This court acted very quickly, which we appreciate, and denied the emergency stay. Then there was an order to show cause hearing where GCC seemingly would be held in contempt if it did not either turn the money over or post the bond as envisioned by the district court, that is, the modified bond. So GCC posted the modified bond. It did that immediately on the day of the show cause hearing, and the district court yesterday accepted that bond. So as things stand now, there is a bond in place. However, as we noted in our motion papers to this court on the emergency stay, what that would mean in effect is that if the bond were to go into effect, it could root this appeal. And that's why what we would ask is if this court believes that, first, that we don't win the 60-B appeal, but, second, that we do win this appeal, that this court would vacate the bond and therefore not force us to effectively have rooted our appeal because we were put in, again, an impossible position where either we face contempt or post the bond. So we posted the bond. Clarify for me right now. If the bond went into effect, it has gone into effect because you have done that. So what is the implication that would move this appeal? That's not clear to me. Why would it move this appeal? So if this court believed that we were correct on the turnover order and it should be reversed because of any of the reasons that we gave, under the language of the bond that we were forced to accept by the district court or else face contempt, that does not prevent them from collecting on the bond, meaning that we have to pay out on the bond. The money as opposed to the assets that were the subject of the turnover order. Is that your point? Yes. I mean, in theory, it could be other money, but the same is true of the turnover order. The turnover said you turn over this property or other assets in Mexico. Effectively, the same is true. We'd be turning over the money to satisfy the bond regardless of the outcome of this appeal if the bond goes into effect. That's why we went to an emergency motion this morning. Because the 60B motion and the turnover order are connected. The 60B – well, from the bond's perspective, if we went on the 60B, they can't collect. But from the bond's perspective, the turnover order appeal effectively doesn't exist, regardless of what happens in it, they still can collect. And that's what we think was unjust, and that's why to make this court's judgment effective, it would have to vacate the bond as well. All right. Thank you, counsel. Thank you. Please proceed. Good morning. Juan Perla for Appellee Simpson. And may it please the Court. This Court's binding decision in United International Holdings v. Wharf remains good law and controls the disposition of this appeal. Nothing that GCC has argued undermines that holding or the validity of this Court's reasoning in that decision. Mr. Perla, just one aside. Do you agree that Colorado has their own extraterritoriality doctrine? Yes, Your Honor. I think that for all practical purposes in this case, you'd be looking at the same principles in both. Okay. Thank you. And the Wharf Court's reasoning has been followed by subsequent circuits, including the Fifth Circuit, and then previously and also subsequently by the Second Circuit in the Motorola and Kohler and Hewlett-Packard decisions, a district court in the Seventh Circuit as well. So there is momentum that continues to affirm what this Court did in Wharf, and there's no reason why this panel should overrule that decision and depart from this growing consensus. I will begin with the point about international economy, because GCC has made a big deal about the second Mexican TRO, and I think the panel here has correctly observed that that TRO has not yet, and GCC concedes, been reviewed in the first instance by the district court, because it happened after the TRO, the turnover order issued, after the appeal was taken, and after a motion to stay the turnover order was denied. And there are problems with that second Mexican TRO, and it would be helpful for this court to have the benefit of the district court's analysis when reviewing what effect, if any, that order should be given. And I would, like Judge Matheson said, look to the Second Circuit's decision in Motorola for guidance. In that decision, the Second Circuit reviewed the findings that the district court had made about the effect that that order should be given. And I'll quote from that Motorola decision, where the Second Circuit says, there is no merit in defendant's contention that the district court could not order defendants to turn over Nokia's shares in Telsom, which were Turkish shares, while a presumptively valid Turkish injunction barred Telsom shares from being transferred abroad. And the court, the district court in Motorola said the timing of when that order was procured in the Turkish courts made it so that it could not be recognized here, because it was procured while the turnover order motion was still pending. Here, it was procured after the turnover order was issued. So that was a problem. Well, yes, but in one sense you suggest that we would benefit from district court findings. Well, we don't have them. So what is the implication of that here? I mean, are you suggesting that it would be appropriate for us to remand for the court to make findings, or can we decide this on our own now? No, Your Honor, let me be clear about that. I think that the turnover order should be affirmed, because at the time that it was issued, it was properly issued. And the consequences, if any, of the second Mexican TRO can be reviewed after the district court issues its contempt and sanctions order below, and presumably GCC would appeal from that decision, and then there would be findings that this court could review with respect to the effect that the second Mexican TRO could be given. So with that, I'll also add that it's actually kind of odd for GCC to be relying on the second Mexican TRO in this appeal, because the second Mexican TRO does not adopt any of GCC's Mexican law arguments. The ones that they have made in these proceedings as to a true conflict between the turnover procedure and Mexican law. Either they didn't make those arguments to the court in Mexico City because they understood they were frivolous, or as the district court here found, implausible, or they made those arguments to the court in Mexico City and the court rejected them. Because the basis for the TRO, the second Mexican TRO, is not that there is a conflict between Mexican law and the TRO. It's this abstract notion about the enforceability of the award in Mexico. So I don't think that the second Mexican TRO really helps them on the point of a conflict between the turnover order and Mexican law. You alluded to a contempt proceeding. Are they still subject to possible contempt proceedings in the district court? There are ongoing contempt and sanctions proceedings in the district court because of their failure to comply with the turnover order. Initially? At all. Okay. They have never complied with the turnover order. Yes, yes, yes, that's right. Yes, correct. Okay. And that order was in effect since February 22nd when this court denied the stay of the turnover order pending appeal. The only reason SIMSA didn't go into court to enforce the order at that time was because there was a standstill agreement in which SIMSA, in furtherance of good faith settlement negotiations, agreed it wouldn't enforce it until May 17th. But the obligation to comply began to run as of February 22nd. Before I leave the second Mexican TRO, I'll add another point. Because GCC's Mexican law expert made very clear in one of his reports in connection with the turnover procedure that a Mexico City court or Mexico City rules would have no application. He said, and I point you to appendix 1278, paragraph 6, where GCC's own Mexican law expert says that a Mexico City court wouldn't have jurisdiction because GCC is not located in Mexico City. These assets are not located in Mexico City. And even said it was baffling that SIMSA was referring to Mexico City rules. I will, again, I will leave the point. Did SIMSA or GCC was referring to Mexico City rules? SIMSA had alluded to Mexico City's exemption rules. Okay. And the. Okay. Okay, got it. Correct. Okay. So I will address, Your Honor, the question about possession. Because I think this is a pretty straightforward point. There is an unbroken line of cases, beginning with the Colorado Supreme Court's decision in Hudson back in 1966, through this court's decision in Wharf in 2000, and then subsequent decisions of the Colorado District Court, all reading Rule 69G to reach assets owned by the judgment debtor and unilaterally controlled by the judgment debtor, even if they're being physically held by a third party at the time that the order issues. In Hudson, the Colorado Supreme Court decision, the assets were in custody of a different court. And the issuing court, and Hudson said that it was proper to issue a turnover order, even though the judgment debtor was not physically holding those assets. And, of course, in Wharf, Your Honors, you know that it's basically this case. You have a situation where it's foreign bank accounts and shares being held by third party brokers, and the court ordering the turnover of those, even though the judgment debtor didn't have physical custody of that. And why is it that possession does the work that is necessary for ordering GCC to turn over these assets? Because possession gets at the idea of ownership. If you are the owner of those assets and you're the only one that controls them, of course you can comply with the order. That's the common sense reading of it. Otherwise, you could say, well, gee, I'm sorry, I can't turn over my cash because the bank down the street has it. Or, gee, I'm sorry, I can't turn over my car because I parked it across state lines in my friend's garage. That just doesn't make sense, especially in light of the Colorado Supreme Court's instruction in ISIS litigation that we must read Rule 69G liberally for the purpose of enforcing our judgments. Wouldn't there be some argument about in-rim jurisdiction and the fact that that would be an impediment to the turnover order? Well, Your Honor, I think there has been some confusion that GCC has created around this concept of in-rim jurisdiction. This is not a writ of execution. Turnover procedures are not an order that the district court issues saying, U.S. Marshals, go down to Mexico and get these bank accounts and these shares and bring them to the U.S. This is a turnover order which is based on personal jurisdiction that the district court has over GCC. It's an instruction for GCC to carry out a transaction. How GCC has to comply with that is up to GCC, and the location of those assets, as this court said in Wharf, is irrelevant. I would say, in addition to the point about possession, that the out-of-state cases that GCC cites are inopposite. First of all, Colorado doesn't have to read the term possession the same way that New York does. I think that Colorado is capable to read possession the way that it sees fit. Also, the cases that are being cited out in New York are not judgment debtor cases. They are garnishee cases, and in that context, the provisions make sense to include more specifically custody and control because the garnishee is not the owner of the judgment debtor's assets. So while it may seem that they're going after a garnishee to get assets, if the garnishee doesn't actually have the assets in physical custody, they may not have the power to control the disposition of the party who has those assets. And that is what the Second Circuit or the New York Supreme Court of Appeals was concerned about in the Northern Mariana Islands cases. In itself said, there is no – this bank doesn't have the capability to order its subsidiary to turn over the assets. And with that, Your Honor, I think I will conclude unless there are any other questions and urge this Court to follow Worf and the Sister Circuit decisions like it and affirm the turnover order as a proper exercise of the Court's power  Thank you for your argument, counsel. You ran over, but we will give you a minute to bring this thing home. Thank you, Your Honor. I appreciate it. And just two quick points. First, when thinking about what you do with this conflict, I think it's important for this Court not to lose sight of Rule 69G itself, which says that turnover does not apply to property, quote, exempt from execution. The district court said, and there's no real dispute, that applying that language, property exempt from execution should be done under Mexican law. Mexican law said this property is exempt from execution. That's unequivocal based on the Mexican court order. Therefore, under the plain language of 69G, turnover would be improper here. That's the first point. The second point on possession, counsel for the other side suggests that Colorado courts have already decided this. They have not. There's no Colorado court suggesting that possession means anything other than its plain meaning, which is that it actually possesses the property. They cite Hudson. Hudson was a case where the property had already been deposited with the court. They cite Worf. Worf never considered this issue of possession at all. And so what we're left with is the plain language of the Colorado rule, which says possession. When Colorado means control, they say control. Here the property is unquestionably not in the possession of the part, for the property at issue here, of the party that over whom the court is jurisdiction. Therefore, turnover would be improper for that reason as well. Thank you, counsel. Thank you. Case is submitted. Thank you for the very fine arguments.